IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LENNY CAIN,

*Petitioner*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Criminal No. ELH-12-019
(Related Civil No.:  ELH-15-3320)

**MEMORANDUM OPINION**

Lenny Cain has filed a Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255 (ECF 393), as supplemented by two additional submissions, ECF 407 and ECF 408 (collectively, the "Petition").  The government filed a response in opposition to the Petition (ECF 413, "Opposition"), along with numerous exhibits.  ECF 413.  Mr. Cain filed a reply.  ECF 421.

Under 28 U.S.C. § 2255(b), a hearing is required "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief . . . ."  This is such a case; no hearing is necessary.  For the reasons that follow, I shall deny the Petition.

## I.       Procedural Background

### A.

This multi-defendant case began with an Indictment filed on January 11, 2012, charging five defendants with conspiracy to distribute and possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 846.  ECF 1.  However, Cain was not named as a defendant at that time.[1]

---

[1] The case was initially assigned to Judge Benson Legg.  It was reassigned to me in June 2012.

Cain was named as a defendant on September 19, 2012, by way of a Superseding Indictment charging Cain and seven others with conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. § 846. ECF 88; *see also* ECF 89. A Second Superseding Indictment was filed on April 10, 2013, adding a second count against Mr. Cain, for distribution and possession with intent to distribute oxycodone. ECF 229. All seven of Mr. Cain's codefendants pled guilty.

Mr. Cain proceeded to a jury trial that began on May 13, 2013. ECF 257. At trial, Mr. Cain testified in his own behalf. On June 7, 2013, the jury convicted Cain of conspiracy to distribute or possess with intent to distribute oxycodone (Count One) and distribution of oxycodone (Count Two). ECF 295.

Sentencing was held on September 26, 2013. ECF 346; ECF 369 (Sentencing Transcript). According to the Presentence Report (ECF 322, "PSR"), Cain had a total offense level of 38. *See* ECF 322, ¶ 32. The PSR included a two-level upward adjustment for possession of a handgun (*id.*, ¶ 25), which I rejected at the sentencing. It also awarded four levels for a leadership role in the conspiracy. *Id.* ¶ 27. However, I awarded only a three-level enhancement for a managerial role. ECF 369 at 79. Therefore, I found that Mr. Cain had a final offense level of 35 and a criminal history category of VI, with an advisory sentencing guidelines range of 292 to 365 months' imprisonment. ECF 351 at 1; ECF 322; ECF 345 (Amended Presentence Report); ECF 369 at 79.

I sentenced Mr. Cain to concurrent terms of imprisonment of 160 months as to Count One and Count Two. *See* ECF 350 (Judgment). That sentence was well below the bottom of the advisory sentencing guidelines range.

Following the sentencing, Mr. Cain noted an appeal. ECF 347. Mr. Cain was represented on appeal by the same lawyer who represented him at trial. On October 7, 2014, the United States Court of Appeals for the Fourth Circuit affirmed the conviction, in an unpublished opinion. *See* ECF 383; *see also United States v. Cain*, 586 Fed. App'x 104 (4th Cir. 2014) (per curiam). The mandate issued on November 12, 2014. ECF 387. Thereafter, on March 23, 2015, the Supreme Court denied Mr. Cain's petition for writ of certiorari. *Cain v. United States*, 135 S.Ct. 1571 (2015).

## II.      Factual Summary[2]

Set forth below is a very abbreviated version of the evidence adduced at trial.

In 2010, Mr. Cain and several others conspired to create phony prescriptions for oxycodone pills, a Schedule II controlled substance; to fill those prescriptions at Baltimore area pharmacies; and to resell the pills for profit.

Joseph Church, a codefendant, testified at trial that he and Mr. Cain were "best friends" (ECF 364, Transcript of 5/22/13, at 43) as well as "partners" in the oxycodone enterprise. *Id.* at 52. Church stated that he "brought [Cain] into the operation" (*id.* at 43) and added: "I taught him everything he knew." *Id.* at 44. According to Church, both he and Cain sold the pills and

---

[2] In the summary, I do not always provide a description of each ECF number referenced herein. For the convenience of the reader, set forth below is a quick reference to the transcript citations.

ECF 362: Transcript for 5/20/13
ECF 363: Transcript for 5/21/13
ECF 364: Transcript for 5/22/13
ECF 365: Transcript for 5/28/13
ECF 366: Transcript for 5/23/13
ECF 367: Transcript for 5/29/13
ECF 368: Transcript for 6/4/13
ECF 369: Transcript for 9/26/13
ECF 371: Transcript for 6/3/13

"split" the proceeds. *Id.* at 53; *see id.* at 43-46, 56. The sales of oxycodone generated $30,000 to $40,000 per month. *Id.* at 56.

Church explained that, through a friend, he and Cain obtained "a fake ID" in the name of Christopher Markley. ECF 364 at 45. In addition, Church recounted that, as the "head of the operation" (*id.* at 46), he and Cain "recruited runners" to go into the pharmacies, because they "didn't want to go in . . . ." *Id.* The runners included Eddie Moyer, Joseph Hopper, and Jason Baldwin. *See*, *e.g.*, ECF 364 at 47-48; ECF 362 at 184.

Several other members of the conspiracy also testified at the trial. For example, Wendy Pinkard was recruited by Church, who was then her boyfriend. She worked at a doctor's office, where she stole prescription forms and verified phony prescriptions upon calls from pharmacists seeking to establish the legitimacy of the prescriptions. *See*, *e.g.*, ECF 362, Transcript of 5/20/13, at 158-61. Cain used some of the prescriptions that Pinkard obtained to acquire oxycodone. *Id.* at 173-74; ECF 364, Transcript of 5/22/13, at 57.

During the investigation, law enforcement conducted a court-authorized search of the residence of Ms. Pinkard. Agents recovered, *inter alia*, prescription pads, a gun, and identification in the name of "Christopher Markley." ECF 362, Transcript of 5/20/2013, at 179-181. Ms. Pinkard stated that she did not know a person by the name of Christopher Markley. *Id.* at 180. Moreover, she claimed that Church and Cain were the ones who had the Markley identification. *Id.* In addition, a notebook was recovered that detailed the pharmacies utilized during the conspiracy. *Id.* at 182-84; ECF 364, Transcript of 5/22/13, at 63-66. Some of the handwriting was Pinkard's and some was that of Church. ECF 362 at 182-83.

At the relevant time, Nneka Ewell worked as a medical assistant at a medical clinic in Baltimore. ECF 363, Transcript of 5/21/13, at 141. Cain recruited her to answer phones and to

verify phony prescriptions.  *Id.* at 142-44, 165; ECF 364 at 49.  Ewell testified that Cain came to her office with Loni Holbeck, a patient at the clinic, to seek Ewell's assistance in obtaining prescription pads.  ECF 363 at 142-45, 165.  Holbeck was one of the drug dealers to whom Church and Cain sold oxycodone pills.  ECF 362, Transcript of 5/20/13, at 88, 95-96; ECF 364, Transcript of 5/22/13, at 53-56.

Cain initially asked Ewell to steal prescriptions.  ECF 363 at 144-45.  When she refused, Cain asked her to answer the phone and verify the prescriptions if the pharmacists called to check.  *Id.* at 145.  Ewell agreed, and Cain provided her with a cell phone that he or Church would call to alert her to expect a call from a pharmacy.  *Id.* at 145-46; *see* ECF 364 at 51-52. When Cain called, it generally was for a prescription for 30 mg oxycodone pills in the patient name of "Christopher Markley."  ECF 363 at 146-47.

Another conspirator, Jason Baldwin, was involved in writing phony oxycodone prescriptions in the name of Christopher Markley.  ECF 362, Transcript of 5/20/13, at 64-66, 76. He also worked as a "runner," entering pharmacies to fill phony prescriptions, including with Cain.  *See*, *e.g.*, ECF 362 at 62-63, 80-89, 161; 184; *see also* ECF 364 at 44-45, 58-60, 62-63. During a search of Baldwin's residence, law enforcement recovered a notebook in which Baldwin had practiced signing the name of "Christopher Markley," and the name of a doctor. ECF 362 at 77-78.

Christopher Markley testified that at some point he lost his license (Govt. Exhibit 46), and reported the loss to the MVA.  ECF 364, Transcript of 5/22/13, at 153.  He claimed that he did not know various conspirators.  *Id.* at 155.  Moreover, he denied that he used his identification to obtain prescription pills of oxycodone.  *Id.* at 154.

Codefendant Edward Moyer testified that he filled phony prescriptions of Oxycodone in the name of his brother, Shawn Moyer, using his brother's ID. ECF 364, Transcript of 5/22/13, at 47-48; ECF 363, Transcript of 5/21/13, at 197-203. He obtained the fraudulent prescriptions from Mr. Cain. ECF 363 at 199, 201. Mr. Cain also supplied the identification of Shawn Moyer, in whose name prescriptions were written. *Id.* at 199-200, 202. Edward Moyer gave the oxycodone pills that he obtained to Mr. Cain, in exchange for money and pills. *Id.* at 200, 203-204.

At trial, Shawn Moyer testified that he was incarcerated in October 2011. ECF 363, Transcript of 5/21/13, at 87. Further, he was unable "to pass" prescriptions from November 2010 to January 2011. *Id.* at 85-86. He also stated that his wallet, with his identification, was stolen at a bar about two weeks prior to his incarceration. ECF 363 at 86. The ID was returned to his home, while he was incarcerated. *Id.* However, Shawn Moyer never saw it when he was released. *Id.* And, he stated that his brother, Edward Moyer, had access to it. *Id.* He also denied passing phony prescriptions. *Id.* at 87.

Church and Cain, along with Justin Serio, created fake prescriptions on a computer. ECF 362 at 164-65. They printed them on special prescription paper that had been obtained via the internet. *Id.* at 61-62; ECF 364 at 50-51, 70-71. A phone number of a conspirator was put on the prescription forms in the event a pharmacy called to verify the prescription. ECF 362 at 62.

Dustin Ray, who had been incarcerated with Cain and Church, testified about several of the conversations he had with Cain. According to Ray, Cain disclosed that he and Church were working together. ECF 363, Transcript of 5/21/13, at 178-79. Cain also told Ray that he had gone into pharmacies himself on a few occasions. *Id.* at 178-80.

Law enforcement was alerted to the prescription fraud scheme involving oxycodone when pharmacies contacted law enforcement to report suspicious prescriptions submitted in the names of Markley and Shawn Moyer. One report was made on October 21, 2010, by the Medicine Shoppe in the area of Brooklyn Park in Anne Arundel County, Maryland. ECF 364 at 159-160. As a result, Anne Arundel County Police Department Detective Bernard Adkins went to the pharmacy and reviewed surveillance for the relevant dates of October 20 and October 21, 2010. *Id.* at 160-161, 164-167. The surveillance video captured Cain as he was dropping off the prescription and then attempting to retrieve the filled prescription. *Id.*; *see also id.* 164-67. Cain's fingerprint was found on the original prescription that had been provided to the Medicine Shoppe on October 20, 2010. ECF 366, Transcript of 5/23/2013, at 35-37.

About a month later, on December 1, 2010, a Walgreen's pharmacy in Severna Park, Maryland, contacted Detective Adkins about a suspected forged prescription for oxycodone in the name of Shawn Moyer, dated November 26, 2010. ECF 364 at 167-169. Again, Detective Adkins obtained a surveillance video. It showed Edward Moyer entering the Walgreen's pharmacy, followed by Cain. ECF 363 at 205-207.

Through the investigation of pharmacies in the area, law enforcement identified 18 Oxycodone prescriptions filled in the name of Christopher Markley and six in the name of Shawn Moyer. Government Trial Exhibit 10 (J.A. 719A); *see also* ECF 365, Transcript of 5/28/13, at 76-76; ECF 413-5. The government also introduced evidence of two attempts by Cain and/or Edward Moyer to pass phony prescriptions. ECF 364 at 158-60. In sum, the government introduced 26 prescriptions, each for 180 Oxycodone pills, 30 milligrams each, for a total of 140,400 milligrams of Oxycodone. ECF 365, Transcript of 5/28/13, at 117-18; *see also* Government Exhibit 10.

Original prescriptions in the names of Christopher Markley and Shawn Moyer were also obtained from the pharmacies. ECF 364 at 127-130, 159-160, 168, 177-182, 192-195, 214-216. Cain's fingerprints were found on eleven original prescriptions in the name of Christopher Markley and on three original prescriptions in the name of Shawn Moyer. ECF 366, Transcript of 5/23/13, at 35, 37-39, 64-68, 79-90; ECF 365, Transcript of 5/28/13, at 68-70.

Additional facts are included in the Discussion.

### III.    Standard of Review

Pursuant to 28 U.S.C. § 2255(a), a prisoner in federal custody may "move the court which imposed the sentence to vacate, set aside or correct the sentence," but only on certain grounds: "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. . . ." *See also United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015).

Collateral attack is not a substitute for direct appeal; failure to raise certain issues on direct appeal may render them procedurally defaulted on post-conviction review. *United States v. Frady*, 456 U.S. 152, 165 (1982); *accord Bousely v. United States*, 523 U.S. 614, 630 (1998). As a general rule, a petitioner who fails to raise a claim on direct appeal is barred from raising the claim on collateral review. *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006). However, this bar generally does not apply to claims pertaining to ineffective assistance of counsel. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 503–04 (2003).

Under 28 U.S.C. § 2255(b), the post-conviction court must hold a hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *See, e.g.*, *United States v. Lemaster*, 403 F.3d 216, 220-23 (4th Cir. 2005); *United States v.*

*White*, 366 F.3d 291, 302 (4th Cir. 2004). Courts have determined that a hearing is not necessary where "the motion . . . fail[s] to allege sufficient facts or circumstances upon which the elements of constitutionally deficient performance might properly be found [or] where the defendant has failed to present any affidavits or other evidentiary support for the naked assertions contained in his motion." *United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998) (internal quotation marks and citation omitted); *accord United States v. McGill*, 11 F.3d 223, 225–26 (1st Cir. 1993). On the other hand, a hearing is generally "required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve this issue." *United States v. Robertson*, 219 Fed. App'x 286, 286 (4th Cir. 2007); *see also United States v. Ray*, 547 Fed. App'x 343, 345 (4th Cir. 2013).

I am mindful that a self-represented litigant is generally "held to a 'less stringent standard[ ]' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same). Nevertheless, I am satisfied that no hearing is necessary to resolve Cain's claims.

## IV.    Ineffective Assistance of Counsel

Mr. Cain was represented at trial and on appeal by a seasoned attorney, Gary Ticknor, Esquire. In his Petition, Mr. Cain asserts numerous claims of ineffective assistance of counsel,

both at trial and on appeal. *See*, *e.g.*, ECF 393-2; 393-5; 393-8; ECF 398; ECF 408. Before addressing these claims, I pause to review the principles that guide my analysis.

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Id.* at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, ___ U.S. ____, 133 S. Ct. 1103, 1107–8 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52 (1985); *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562

U.S. 86, 88 (2011) (quoting *Strickland*, 466 U.S. at 690). The burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).

As the Supreme Court recently reiterated, the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149. "The lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Harrington*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015). Indeed, "the *Strickland* standard must be applied with scrupulous care," *Harrington*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.*

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776;

11

*Lafler*, 566 U.S. at 163. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687.

The *Padilla* Court said, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." This is because a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## V.     Discussion

### A.  Conflict of Interest

Mr. Cain contends that his attorney was ineffective for failing to raise at trial the alleged conflict of interest on the part of Catherine Flynn, Esquire. She represented Joseph Church, a codefendant who testified at trial for the government, and an attorney in her office briefly represented Mr. Cain in regard to related State charges. *See* ECF 393-2; ECF 407; *see also* ECF 406 (Cain Affidavit). Cain asserts, *inter alia*, a violation of his due process rights under the Fifth Amendment to the Constitution, based on the simultaneous, overlapping representation of Cain and Church by Ms. Flynn and a member of her law firm.

As the government points out (ECF 413 at 10), Mr. Cain is plainly incorrect in contending that his lawyer failed to raise the issue at trial. The record reflects that on the second day of trial, May 20, 2013, the Court was alerted to an "impending motion in limine" concerning the testimony of Mr. Church, who was represented by Ms. Flynn from the inception of the case. ECF 362, Transcript of 5/20/13, at 209-10.

In particular, Mr. Cain's defense attorney advised the Court that Mr. Cain was initially charged in State court and, at the outset, he was represented by a lawyer named Flynn Owens, who was not affiliated with Ms. Flynn. *Id.* at 210. However, Cain subsequently hired Margaret Mead, Esquire, a partner of Ms. Flynn. *Id.* Thereafter, Mr. Cain was represented by Rodney Gray, another lawyer in Ms. Flynn's office. *Id.*; *see also* ECF 363 at 241.[3] In response to this information, I stated, ECF 362 at 210: "I find it appalling that this would be out there and I have not known about it." But, as Mr. Ticknor explained, the information was not known to him. *Id.* And, he claimed that although Mr. Cain knew the lawyer who had previously represented him, he did not disclose it because he did not appreciate the significance of it. *Id.* at 226.

When the prosecution was made aware of this information, government counsel conferred with Ms. Flynn and proffered that she had "absolutely no recollection of ever meeting Mr. Cain." *Id.* at 212. Nor was there any indication in any of the firm's records that Ms. Flynn ever interacted with Mr. Cain. *Id.* Nevertheless, defense counsel sought to disqualify Mr. Church as a witness, on the basis of Ms. Flynn's conflict, alleging a violation of the Sixth Amendment. *Id.* at 213-14.

The Court said, *inter alia*: *id.*: "This is complete and shocking information after we're two days into this trial. This is the first anyone has raised it with me. But if there were a

_____

[3] Mr. Gray was initially misidentified as Rodney Lang. ECF 362 at 210.

violation of [the defendant's] Sixth Amendment rights because of a conflict of interest on Ms. Flynn's part, . . . the remedy is typically to disqualify the lawyer." *Id.* at 214.

The Court continued to discuss the matter with counsel the next day, May 21, 2013. *See* ECF 363, Transcript of 5/21/13, at 228-254. Mr. Ticknor vigorously argued the issue, insisting that the appropriate remedy required the Court to bar the testimony of Mr. Church. *Id.* at 234.

Based on the information presented to the Court, Ms. Flynn was called to appear, by telephone, on May 21, 2013. *See* ECF 363 at 240-253. She confirmed that Mr. Gray is her partner, and that Mr. Cain came to the law firm's office on August 29, September 22, October 3, and October 24 of 2011. ECF 363 at 234. But, Ms. Flynn claimed that she never met Mr. Cain. Moreover, the firm's file for Mr. Cain contained an interview sheet (*id.* at 245), but it did not contain a Statement of Probable Cause, and so Ms. Flynn was unaware of the allegations. *Id.* at 234. She also stated that Cain paid the firm a legal fee of $1,000. ECF 363 at 246.

Although Ms. Flynn initially indicated that the office file had no discovery (ECF 363 at 245), she later corrected that assertion, stating that it contained discovery that she never saw. ECF 364, Transcript of 5/22/13, at 2-3. Further, she related that the State charges against Mr. Cain were dismissed on October 25, 2011, without the need for Mr. Cain to appear in court. *Id.* at 243.

Ms. Flynn maintained that she never looked at the firm's file for Mr. Cain until the issue arose at Mr. Cain's trial. *Id.* at 247. Notably, Ms. Flynn was unaware that Mr. Cain had been represented on the State matter by a colleague at her law firm. ECF 363 at 251. Also of import, she indicated that she never disclosed to the government any information about Mr. Cain based on the firm's representation of him. *Id.* Indeed, she explained that she only learned of the firm's

earlier representation of Mr. Cain when she was contacted by the government during Mr. Cain's federal trial. *Id.* at 247.

As noted, the original Indictment (ECF 1) was filed on January 11, 2012. When Mr. Church was indicted federally, Ms. Flynn began her representation of him. But, Mr. Cain was not a defendant in the federal case at that time. ECF 363 at 247-248. In particular, Mr. Cain was not named as a defendant until the Superseding Indictment was filed some nine months later, on September 19, 2012. *See* ECF 88. And, by that point, Mr. Church had already entered a guilty plea. *See* ECF 72; ECF 73.

In response to the conflict issue, the Court reviewed, *inter alia*, *United States v. Taft*, 221 Fed. App'x 277 (4th Cir. 2007) (per curiam) and *United States v. Pizzonia*, 415 F. Supp. 2d 168 (E.D.N.Y. 2006) (Weinstein, J.). *See* ECF 362 at 211; ECF 363 at 232.

In *Taft*, 221 Fed. App'x 277, the defendant moved to bar the government from calling as a witness an individual who had purchased drugs from the defendant. The witness was represented by the same lawyer "who at one time had represented" the defendant. *Id.* at 279. The attorney represented the witness "in an unrelated criminal proceeding and had undertaken that representation three weeks before withdrawing" as defendant's attorney. *Id.* at 278. The Fourth Circuit recognized that "overlapping representation" of two clients can violate the Fifth Amendment's guarantee of due process "where it compromises the fundamental fairness of a defendant's trial." *Id.* at 279. Moreover, it can compromise a defendant's Sixth Amendment right to the effective assistance of counsel "when it creates an actual conflict of interest." *Id.* But, the Court also said: "The mere fact of overlapping representation is insufficient to create a Sixth Amendment violation." *Id.*

And, the *Taft* Court found no Fifth Amendment due process violation. It reasoned that there was no proffer of evidence to show that the overlapping representation "had any impact on Appellant's trial, much less one that undermined its fundamental fairness." *Id.*

Unlike in *Taft*, the representation here was by different lawyers, albeit from the same law firm. But, to the extent of any overlapping representation here, it was quite brief. Moreover, Church's lawyer was completely unaware of the prior representation of Cain by a colleague in her office, which was in regard to a State case that was dismissed, without the need for Cain to even appear in court. Notably, Cain had not been named as a defendant in the federal case until about nine months after Mr. Church was indicted. By that point, Church had already entered a guilty plea. And, when Cain was named as a federal defendant in the Superseding Indictment, he obtained another attorney, with no connection to Ms. Flynn or her office.

Of paramount significance, there is no indication whatsoever that any of the information introduced through Church was obtained as a result of the brief representation of Mr. Cain by a lawyer in Ms. Flynn's office. Indeed, none of the lawyers knew of the overlapping representation. It was Mr. Cain who belatedly brought the information to his attorney's attention, and only after the federal trial began.

Relying on *Taft*, I concluded that the mere fact of overlapping representation was insufficient to establish a violation of the Sixth Amendment. *Id.* at 253. Moreover, I determined that the defendant's Sixth Amendment right was not compromised; he was not deprived of effective assistance of counsel. I noted that, when Ms. Flynn was retained by Mr. Church, Mr. Cain had not yet been indicted. *Id.* at 254-255. And, within days of Cain's federal indictment (ECF 88), Mr. Ticknor was appointed to represent him. *See* ECF 104 (appointment of Mr. Ticknor on 9/25/12).

I am equally satisfied that there was no Fifth Amendment due process violation under the facts presented here. As to Ms. Flynn, I said, ECF 363 at 253:

> [S]he's made very clear that she had absolutely no idea of anything that Mr. Cain said. She never disclosed anything to the government. She personally didn't represent Mr. Cain. I realize the significance of the fact that her partner did. But in reality, her review of the file reveals that it was a state district court case that was dismissed. And she doesn't, even now as we speak, have any basis to conclude that it's even the same or related case, much less have any knowledge about anything that Mr. Cain ever revealed by way of attorney/client confidential communications.[4]

Because Ms. Flynn was unaware of the representation of Mr. Cain by another member of the firm, that prior representation could not have "had any impact on her work or the proceeding itself." ECF 413 at 13.

And, Cain's own trial lawyer clearly did not suffer from a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Woodfolk v. Maynard*, 857 F.3d 531, 553 (4th Cir. 2017); *United States v. Dehlinger*, 740 F.3d 315, 322 (4th Cir. 2014); *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002). "To establish ineffective assistance of counsel on conflict of interest grounds, a petitioner must establish that (1) his attorney labored under 'an actual conflict of interest' that (2) 'adversely affected his lawyer's performance.'" *Mickens*, 240 F.3d at 355 (quoting *Cuyler*, 446 U.S. at 348). "If the defendant satisfies this showing, prejudice is presumed . . . ." *Woodfolk*, 857 F.3d at 553; *see United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010).

The foregoing makes clear that, contrary to Mr. Cain's assertion, Mr. Ticknor raised and pursued the conflict issue and the Court seriously considered it. Under the circumstances here, there was no violation of Cain's Fifth or Sixth Amendment rights. And, as the government puts

---

[4] I invited defense counsel to present the Court with authority to suggest that my ruling was erroneous, in which case I would revisit my ruling. *Id.* at 255. That did not occur.

it, "because Mr. Cain could not establish that he was entitled to any relief based on Ms. Flynn's representations [of Mr. Church], he cannot establish prejudice in this case." ECF 413 at 13.

## B. Questioning of Witnesses by the Court

Cain complains that his attorney was ineffective for failing to object to the Court's alleged excessive questioning of witnesses at trial, including Mr. Cain, who testified in his own behalf. Cain asserts, *inter alia*, that the Court asked 200 questions of witnesses, "taking over the trial . . . ." ECF 393-3 at 2.

Mr. Ticknor, who served both as trial and appellate counsel, did not object at trial, but he did raise the issue on appeal. The Fourth Circuit considered the matter under the plain error standard and concluded that Cain did not establish plain error. ECF 383 at 8.

"[F]ederal judges need not sit silently during the presentation of evidence at trial." *United States v. Lefsih*, ____ F.3d ____, 2017 WL 3469214 at *5 (4th Cir. Aug. 14, 2017); *see also* Fed. R. Evid. 611(a). Indeed, judges are not automatons who are required "to sit back and observe trials as nonchalant spectators, as judicial participation is frequently necessary to ensure that uncertainty sown during testimony does not culminate in jury room confusion." *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006); *see also United States v. Parodi*, 703 F.3d 768, 775 (4th Cir. 1983).

To be sure, there are limits on the broad discretion afforded to a trial judge with respect to judicial intervention. *Lefsih*, 2017 WL 3469214, at *5. As the *Lefsih* Court noted, the "limits are breached when judicial intrusion gives rise to an 'appearance of bias or partiality'. . . ." *Id.* (citation omitted). This occurs when, through its questions, the court 'interjects a 'negative impression' of the defendant [or] conveys 'skepticism' of the defendant or his evidence . . . ."

*Id.* In that circumstance, the court "has crossed the line from active trial management to 'unfairly lending the court's credibility' to the government's case." *Id.* (citation omitted).

Upon a review of the transcript, I am readily satisfied that the questions posed by the Court were neither objectionable nor prejudicial; they did not cross the line.[5] To the contrary, the questions served largely to clarify ambiguities and to avoid confusion. *See Smith*, 452 F.3d at 333 (concluding that judicial attempts to clarify confusing testimony were "hardly inappropriate").

For example, Cain cites, *inter alia*, the testimony of David Cline, a witness called by the defense, to illustrate his claim of bias. Cline "run[s] an independent pharmacy" in Maryland. ECF 367, Transcript of 5/29/13, at 99. On two occasions, the Court sought to clarify procedures as to the way that prescriptions are filled at that pharmacy. *Id.* at 100-102. On the first occasion, defense counsel was questioning the witness about the requirements to complete a prescription. *Id.* at 99-100. The Court sought to elucidate the witness's distinction between the requirements for a new patient versus a returning patient. *Id.* at 100. If anything, the clarification was helpful to the defense, because it demonstrated that the rigorous requirements for a new patient made it less likely for the defendant to have been able to obtain Oxycodone fraudulently.

Another example of the Court's effort to clarify took place during the testimony of Detective Bernard Adkins. ECF 364, Transcript of 5/22/13, at 168-69. Detective Adkins was questioned about the submission of a prescription for fingerprint analysis. *Id.* at 168. Referring to the prescription, Adkins stated: "It matches the photocopies I made when I received it." *Id.* The Court then inquired: "You said you got copies. So if you submitted it for fingerprints, I assume, rather, that you got the original. Did I misunderstand something?" *Id.* at 168-69. The

_____

[5] *See* ECF 413 at 17-19 for a summary of citations to judicial questions challenged by Mr. Cain.

witness then explained: "The original here matches the photocopies I have in my case file." *Id.* at 169. The Court responded: "I see. Okay." It is difficult to discern any prejudice to Cain from the Court's attempt to clarify.

On another occasion, the Court admonished Christopher Markley, an important government witness, to answer defense counsel's questions. ECF 364 at 156-57. The Court also told the witness: "[Y]ou don't get to ask any questions." *Id.*at 157.

It is also noteworthy that many questions were posed and addressed at the bench, outside the presence of the jury. *See*, *e.g.*, ECF 363 at 89-90; *see also*, ECF 413 at 17 n.4. The discussions at the bench were obviously not prejudicial, because they were not heard by the jury.

In sum, there is not the slightest indication of favoritism on the part of the Court. Moreover, Mr. Cain has not identified a single question that was actually objectionable, nor has he shown any prejudice. Rather, the Court complied with the requirements of Fed. R. Crim. P. 611(a), which provides: "The Court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

### C. The Testimony of Joseph Church

As noted, Mr. Church was represented by Catherine Flynn, Esquire. Prior to Church's testimony, he was reluctant to testify, notwithstanding his obligations under his plea agreement. The Court conferred with counsel for the government, counsel for the defense, and counsel for Mr. Church, and all of the attorneys agreed that it would be appropriate for the Court to review with Mr. Church the terms of his plea agreement. ECF 364, Transcript of 5/22/13, at 3-4.

Thereafter, the Court reviewed with Mr. Church the terms and conditions of his plea agreement. *See* ECF 73; ECF 74. The colloquy was similar in several respects to the routine advisement that takes place when a defendant enters a guilty plea. The Court also explained the potential consequences upon a finding of breach of the plea agreement. *Id.* at 4-22. In addition, the Court reviewed the process that occurs when a witness declines to testify. *Id.* at 36-37.

Ms. Flynn engaged in additional colloquy, on the record, with Mr. Church. *Id.* at 21-25. Church expressed concerns about the safety of his family. *See*, *e.g.*, *id.* at 28-30.

The Court invited all counsel to identify any concern with the Court's outline of the process. *Id.* at 37-38. Mr. Ticknor indicated that, if Mr. Church were to refuse to testify, the defendant did not "want the jury told in any way, shape, or form . . . the basis of [Mr. Church's] refusal to testify . . . ." *Id.* at 38. The Court responded, *id.* at 38: "I'm not going to say the basis. I will just say that he's ordered to testify." *Id.* at 38. At the request of the defense, I also instructed Mr. Church not to tell the jury that his refusal to testify was the result of fear. *Id.* at 38. On the contrary, I told him to "simply say that you do not want to testify." *Id.* at 39. Ultimately, however, after Mr. Church conferred privately with his lawyer, he decided to testify. *Id.* at 39-40.

Mr. Cain complains that Mr. Ticknor failed to object to the process followed by the Court. However, Mr. Ticknor raised an objection as to the prospect of any explanation for Mr. Church's refusal to testify, and the Court agreed with that objection, as outlined above. Notably, Mr. Cain has not identified any error in the process followed by the Court. Nor do I discern any prejudice from what transpired.

### D. Admission of Prescriptions

Mr. Cain maintains that his attorney was ineffective because he failed to object to the admission of the original prescriptions recovered from the various pharmacies, on which Mr. Cain's fingerprints were found. ECF 393-96 at 2-3. As the government correctly observes, defense counsel "objected to the prescriptions over and over again, both before and during the trial." ECF 413 at 23 (citing ECF 242; ECF 255; ECF 362, Transcript of 5/20/13, at 2-3, 66-75, 98-102, 189-209).

There is not merit to this contention. Mr. Ticknor lodged numerous challenges, before and during trial, based on authentication and hearsay. Those objections were overruled. Thereafter, defense counsel raised the issue on appeal, and added a claim based on the Confrontation Clause. ECF 383 at 6. Again, the defendant met with no success. *Id.* at 7.

The Fourth Circuit said, *id.*: "We conclude that the district court did not abuse its discretion or plainly err in admitting the prescriptions." The Court explained that "the prescriptions were not hearsay" but "even if they were, they were admissible as co-conspirator statements" under Fed. R. Evid. 801(c) and 801(d)(2)(E). Moreover, the Fourth Circuit stated that "the court did not abuse its discretion in finding [that the prescriptions] were properly authenticated." *Id.* And, the Furth Circuit said, *id.*: "Finally, the Court did not plainly err in admitting [the prescriptions] in violation of the Confrontation Clause because they were not testimonial statements." (Citing *United States v. Keita*, 742 F.3d 184, 189-90 (4th Cir. 2014)).

### E. Fingerprint Evidence

Mr. Cain argues that his lawyer should have sought a *Daubert* hearing to challenge the admissibility of the expert fingerprint examiner testimony. ECF 393-97 at 2. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). According to Mr. Cain, fingerprint

analysis is not always reliable. In addition, he has submitted his own affidavit, claiming that he asked his defense attorney to seek a *Daubert* hearing and also to retain a fingerprint expert. ECF 406 (Cain Affidavit) at 1.

In particular, Mr. Cain complains that only his fingerprints were identified on the prescriptions by the fingerprint examiner, and he seems to suggest that fingerprints of others would have been identified by another fingerprint examiner. ECF 407 (Supplement) at 4. He overlooks that the other defendants did not go to trial, and thus the examiners had no interest in identifying fingerprints of those who already acknowledged their guilt. Rather, the examiners compared latent fingerprints only to the fingerprints of the person whose name was submitted, and that was just Mr. Cain. *See*, *e.g.*, ECF 366, Transcript, 5/23/13, at 30.

The government correctly points out that it never suggested that Mr. Cain was the only person who ever handled the prescriptions at issue. ECF 413 at 25. Logically, at trial, it focused on Mr. Cain, and sought to prove that he handled the prescriptions, because he was the person on trial. *Id.* Even if others had handled the prescriptions, this would not have exonerated Mr. Cain. Therefore, he could not have been prejudiced by the fact that the fingerprint examiners only identified defendant's fingerprints.

In addition, Cain complains that his lawyer failed to obtain a handwriting expert to establish that Baldwin "did not write the prescriptions like he testified that he did." ECF 393-7 at 2; *see also* ECF 406 (Cain Aff.) at 1. He asserts that the handwriting on the prescriptions is not the same. ECF 393-7 at 2.

At trial, Baldwin identified particular oxycodone prescriptions that he wrote. *See* ECF 362 at 63-76 (reviewing government exhibits). However, Mr. Baldwin did not testify that he wrote all of the fake prescriptions for the conspiracy. *See* ECF 362, Transcript of 5/20/13, at 63.

Baldwin was also a "runner," meaning that he took prescriptions to pharmacies to be filled. Mr. Ticknor objected to prescriptions that contained notations from individuals at the various pharmacies. *Id.* at 67-68; 73.

I agree with the government that a handwriting expert who might have testified that Mr. Baldwin did not write all of the prescriptions would have been useless, because there was no claim that Mr. Baldwin ever wrote all of the prescriptions in issue.

In the Affidavit submitted by Mr. Ticknor (ECF 413-9), he recounts that he "consulted with a fingerprint expert on Mr. Cain's behalf to determine whether there was potentially-helpful testimony that could have undermined the government's fingerprint expert." *Id.* ¶ 4. Upon receipt of "an oral report from that expert," he determined that such testimony "would not have undermined the government's fingerprint expert testimony or been beneficial to Mr. Cain's case." *Id.* And, he "communicated this decision to Mr. Cain." *Id.* Counsel's decision was one of strategy; Mr. Ticknor decided, instead, "to raise questions about the fingerprint evidence through cross-examination . . . ." *Id.* These factual averments are not contested.

Moreover, there was no basis to exclude the testimony of the three fingerprint experts who examined evidence that contained Mr. Cain's fingerprints. They had extensive training and years of experience in conducting latent fingerprint comparisons. *See*, *e.g.*, ECF 366, Transcript of 5/23/13, at 17-18, 65-55.

Fingerprint experts have routinely been permitted to testify in this district. The Fourth Circuit has said: "While the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well." *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) (citing cases). Indeed, the Fourth Circuit has recognized that "virtually every

circuit and district court, both before and after *Daubert*, have a longstanding tradition of allowing fingerprint examiners to state their opinion and conclusions, subject to rigorous cross examination. Many courts have even refused to hold an evidentiary hearing for such an inquiry, finding such testimony scientifically reliable." *United States v. Rogers*, 26 F. App'x 171, 173 (4th Cir. 2001) (citing cases). As Judge Blake has said, "Before and after *Crisp*, it appears that ever federal circuit to consider the issue has found expert fingerprint identification testimony admissible, albeit based on somewhat differing conclusions as to the various *Daubert* factors." *United States v. Rose*, 672 F. Supp. 2d 723, 725 (D. Md. 2009).

I also agree with the government that Mr. Cain was not prejudiced by the evidence. Mr. Cain took the stand at trial and, on cross-examination, he acknowledged "touching" the prescriptions. ECF 367, Transcript of 5/29/13, at 239. But, he claimed that the "only possible way [his] fingerprints would be on the scripts is flipping through, seeing what [was] in there." *Id.* at 240. And, he added: "My fingerprint could be on there." *Id.* at 241.

Finally, the evidence of defendant's guilt was overwhelming. *See* ECF 383 at 10 (concluding that evidence was sufficient to support Cain's conviction). Apart from the testimony of numerous witnesses who detailed defendant's role in the conspiracy, the jury saw video evidence of Mr. Cain at various pharmacies where illegal prescriptions were filled. Moreover, as the Fourth Circuit observed on appeal, "'the fingerprint evidence was not the only incriminating evidence of [Cain's] guilt; rather, there was an abundance of evidence' . . . ." *Id.* (quoting *United States v. Burgos*, 94 F.3d 849, 874-75 (4th Cir. 1996) (en banc) (alteration added here).

### F. Shawn Moyer

Mr. Cain maintains that his defense attorney was ineffective because he failed to present additional witnesses to establish that a prosecution witness, Shawn Moyer, appeared before the grand jury, contrary to the witness's representation.  ECF 393-7 at 2.

As recounted earlier, Shawn Moyer is the brother of codefendant Edward Moyer.  Shawn Moyer claimed that he lost his identification prior to his incarceration, which was during the relevant time period.  ECF 363, Transcript of 5/21/13, at 86-87.  The evidence showed that many phony prescriptions for oxycodone were submitted in his name by various conspirators.

Defense counsel sought to impeach Shawn Moyer by reference to his grand jury testimony.  ECF 363 at 87-89.  However, when Shawn Moyer refused to acknowledge his appearance before the grand jury, the parties entered a stipulation that Mr. Moyer had, in fact, testified before the grand jury, notwithstanding his trial testimony to the contrary.  *Id.* at 95-102.

Mr. Cain did not agree with the stipulation.  Rather, he sought the admission of the grand jury testimony of Shawn Moyer.  ECF 363 at 102.

To be sure, a criminal defense attorney must "follow his client's wishes" but "only with regard to the fundamental issues that must be personally decided by the client."  *United States v. Chapman*, 593 F.3d 365, 368 (4th Cir. 2010).  These include matters such as the decisions whether to plead guilty, testify, waive a jury, and note an appeal.  *Id.*  But, it is also "well-established that at a criminal trial defense counsel has the authority to manage most aspects of the defense without first obtaining the consent of the defendant."  *Id.* at 367.  Indeed, defense counsel may make decisions, without the client's consent, that "'primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed.'"  *Id.* at 368 (quoting

*Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998)); *see also Florida v. Nixon*, 543 U.S. 175, 187 (2004).

As the government points out, as a result of the stipulation, "the defense had a stronger argument" about the lack of credibility of Shawn Moyer than it would otherwise have had, *i.e.*, "he lied to the jury about being in the grand jury, as opposed to simply that he may have gotten an inconsequential date wrong either at trial or in the grand jury." ECF 413 at 28. Accordingly, I agree with the government that Mr. Cain was not prejudiced by the failure of Mr. Ticknor to call additional witnesses to establish a point to which the government stipulated.

### G. Multiple Conspiracy Instruction

Mr. Cain argues that he was entitled to a multiple conspiracy instruction. *See*, *e.g.*, ECF 407 at 7, 10; ECF 408 at 1-2; ECF 421 at 11.

The Fourth Circuit said in *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994): "A multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in 'separate conspiracies *unrelated* to the overall conspiracy charged in the indictment.'" (Emphasis in *Kennedy*; citation omitted); accord *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000). Moreover, "[a] court need only instruct on multiple conspiracies if such an instruction is supported by the facts." *United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993).

Notably, "'a single overall conspiracy can be distinguished from multiple independent conspiracies based on the overlap in actions, methods, and goals.'" *United States v. Bartko*, 728 F.3d 327, 344-45 (4th Cir. 2013) (citation omitted). And, a single conspiracy may exist even if the coconspirators "were not always aware of the others' activities." *Squillacote*, 221 F.3d at 574.

In this case, the evidence established a single conspiracy, using different people, at different times, in different roles, for the common goal of obtaining oxycodone illegally in order to distribute it.

Cain joined the conspiracy when he was released from incarceration. ECF 364, Transcript of 5/22/13, at 43-44. It was clear that Mr. Cain was a full participant in the conspiracy during the period when he was involved. *See*, *e.g., id.* at 53 (testimony of Church). Indeed, Mr. Cain was involved in all aspects of the conspiracy, from obtaining prescriptions, filling them, and selling the pills. Although Mr. Church testified about some of his dealings before Mr. Cain joined the conspiracy, he made clear when and how Mr. Cain was involved, along with others who joined and withdrew over time. *Id.* at 64-67. The evidence established a single, on-going oxycodone distribution organization. Cain was not entitled to a multiple conspiracy instruction. As the government put it, ECF 413 at 29: "The fact that Mr. Cain likely had multiple people providing him with fake prescriptions does not establish multiple conspiracies."

## H. Informant Instruction

Mr. Cain contends that Mr. Ticknor was ineffective for failing to request an "informant instruction." ECF 393-8 at 2. This argument is devoid of merit.

In *United States v. Luck*, 611 F.3d 183, 186-87 (4th Cir. 2010) (quoting *United States v. Brooks*, 928 F.2d 1403, 1409 (4th Cir. 1991)), the Court summarized an appropriate example of the "informant instruction," as follows:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest or by prejudice against a defendant.

I gave a more expansive, comprehensive instruction to the jury concerning evaluation of

the testimony of an informant or coconspirator. In particular, I instructed as follows, ECF 371,

Transcript of 6/3/13, at 18-21:

> As you know, there has been testimony from Government witnesses who pled guilty to charges arising out of the same facts as this case, or who testified that they were actually involved in planning and carrying out the crimes charged in the Second Superseding Indictment; that is, that they were accomplices and co-conspirators. The Government argues, as it is permitted to do, that it must take the witnesses as it finds them, and it contends that only people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others. Indeed, certain criminal conduct would never be detected without the use of accomplice and cooperator testimony.

> For those very reasons, the law allows the use of so-called accomplice testimony. Indeed, it is the law in federal courts that the testimony of accomplices may be enough in and of itself for conviction if the jury finds that the testimony establishes guilt beyond a reasonable doubt.

> As you heard, there was evidence that the Government agreed in certain plea agreements to bring a witness' cooperation to the attention of the sentencing court in exchange for the witness' agreement to plead guilty and to testify truthfully, completely, and fully at trial. The Government is permitted to enter into these kinds of plea agreements and to make these kinds of promises, and the Government is entitled to call as witnesses people to whom these promises are given. You, in turn, may accept the testimony of such a witness. You are instructed that you may convict the Defendant on the basis of this testimony alone if it convinces you of the Defendant's guilt beyond a reasonable doubt.

> However, this kind of testimony is of such nature that it must be scrutinized with care and viewed with particular caution when you decide how much of that testimony to believe.

> I have already given you some general considerations on credibility, and I am not going to repeat them all here. Nor will I repeat all of the arguments made on both sides. Let me just say a few things that you may want to consider during your deliberations on the subject of accomplices and on the subject of witnesses who testified pursuant to plea agreements.

> You should ask yourselves whether this witness would benefit more by lying or by telling the truth. Was his testimony or her testimony made up in any way because he believed or hoped or she believed or hoped to receive favorable treatment by testifying falsely, or did the witness believe that his interests would

be best served by testifying truthfully? If you believe the witness was motivated by hopes of personal gain, was the motivation one which would cause him to lie, or was it one which would cause him to tell the truth? Did this motivation color the testimony?

In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you will give to the testimony of any witness. Whether or not you approve of the use of a cooperating witness is not to enter into your deliberations in any way. If you are satisfied beyond a reasonable doubt that the Defendant committed the offenses charged in the Indictment, the fact that the Government made use of a cooperating witness is irrelevant to your determination.

In considering the testimony of an accomplice cooperator, you are instructed that you are to draw no conclusion or inferences of any kind about the guilt of the Defendant from the mere fact that a Government witness pled guilty to the same or similar charges. That witness' decision to plead guilty was a personal decision about his or her own guilt. It may not be used by you in any way as evidence against or unfavorable to the Defendant.

In view of the Court's instruction, there was no need for Mr. Ticknor to request an informant instruction. *See Moore v. United States*, ELH-04-0190, 2012 WL 1198422, at *15-16 (D. Md. Apr. 10, 2012).

## I.  Detective Glenn Hester

Mr. Cain alleges that his lawyer was ineffective for failing to object to the testimony of Detective Glenn Hester, on the ground that Hester improperly testified as both an expert and fact witness.  ECF 393-8 at 3.  This claim is unfounded.

Detective Hester worked for the Baltimore Police Department for 27 years, and for about seven years he was detailed to the Drug Enforcement Administration's Tactical Diversion Squad. ECF 362, Transcript of 5/20/13, at 19.  The government offered him as an expert in narcotics trafficking.  *Id.* at 25.  Defense counsel conducted a voir dire as to Hester's qualifications.  *Id.* 25-28.

A review of the record reveals that the government never called Hester as a fact witness, nor did it pose any fact questions to him pertaining to the case. Rather, it was defense counsel who, on cross-examination, inquired of Detective Hester as to certain facts. But, those questions constituted an effort to undermine the detective's credibility. *See*, *e.g.*, ECF 362 at 48-49.

Because Hester did not testify for the government in a dual capacity, as both a fact and expert witness, the principles of *United States v. Garcia*, 752 F.3d 382 (4th Cir. 2014), were not breached.

## J. The Appeal

Cain contends that Mr. Ticknor failed in his role as appellate counsel because he did not raise several appellate issues that Mr. Cain had requested. *See* ECF 393-8 at 4; ECF 407 at 10. One of those issues concerned Ms. Flynn's representation of Mr. Church. Another concerned the grand jury testimony of Shawn Moyer.

Mr. Ticknor has submitted an Affidavit (ECF 413-9) in which he acknowledges that Cain wanted him to raise on appeal the issues concerning Ms. Flynn's representation of Joseph Church and the issue of Shawn Moyer's grand jury testimony. *Id.* ¶ 5. However, Mr. Ticknor explains why he did not do so. He states that he "did not believe that there was a basis to appeal" these issues (*id.*, ¶¶ 7, 8) and he made a tactical decision not to raise all 27 issues that Mr. Cain had requested. *Id.* ¶¶ 5, 9.

The two-pronged test articulated in *Strickland* applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (stating that "the proper standard for evaluating [the] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington* . . . .); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986). "In applying this test to claims of ineffective assistance of counsel on appeal . . . reviewing courts must accord

appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)).

Notably, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'" *Bell*, 236 F.3d at 164 (quoting *Jones v. Barnes*, 463 U.S. 745, 752 (1983)); *see also Smith v. South Carolina*, 882 F.2d 895, 899 (4th Cir. 1989)). Indeed, there is "strategic value" to "limiting an appeal to several strong arguments rather than diffusing the appellate force over too broad a range of issues." *State v. Gross*, 134 Md. App. 528, 563, 760 A.2d 725, 743 (2000) (Moylan, J.). The Supreme Court recognized as much in *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983), when it said: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Indeed, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (*quoting Barnes*, 463 U.S. at 751-752); *see also Smith*, 882 F.2d at 899 (counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims").

In his role as appellate counsel, Mr. Ticknor had the responsibility to "select the most promising issues to pursue on the appeal . . . ." *Gross*, 134 Md. App. at 561, 760 A.2d at 743. Notably, "the right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports." *Gray v. Greer*,

800 F.2d 644, 647 (7th Cir. 1986). The Seventh Circuit explained in *Gray*, 800 F.2d at 646: "Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Accord Bell*, 236 F.3d at 164.

In selecting a handful of issues, appellate counsel followed the path outlined above. He focused on the issues that "'were most likely to afford relief on appeal.'" *Bell*, 236 F.3d at 164 (citation omitted).

In my view, the claims as to Ms. Flynn and Shawn Moyer would not have been successful on appeal. Therefore, there is no basis to find ineffective assistance of appellate counsel for failing to raise appellate issues that would not have succeeded had they been raised.

### K. Forfeiture

Cain contends that Mr. Ticknor was ineffective for failing to challenge on appeal the forfeiture order entered by the Court, in the sum of $51,840. ECF 407 at 8-9; *see also* ECF 331; ECF 344; ECF 350 at 6.

In *United States v. Fabian*, 798 F. Supp. 2d 647, 684 (D. Md. 2011), Judge Blake observed that 28 U.S.C. § 2255 entitles a prisoner only "to attack the custodial component of a sentence." She acknowledged that the Fourth Circuit has not addressed the question, but observed that almost every Court of Appeals to have considered the matter "has concluded that restitution orders cannot be attacked through a § 2255 petition, including those filed when the defendant is incarcerated. *Id.* (citing cases). She also observed, *id.* at 685, that "most courts have concluded that § 2255 is not the proper vehicle for collaterally challenging noncustodial punishments," and that the same reasoning applies to forfeiture orders. Thus, she concluded that Fabian's "challenge to the order of forfeiture fails." *Id.*

That logic governs here.  The challenge to the forfeiture in this proceeding is misplaced.

## VI. Conclusion

Upon a careful review of the extensive submissions of the parties, I am satisfied that the Petition is without merit.

Unless a Certificate of Appealabilty ("COA") is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).  A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck*, 137 S. Ct. at 773.  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274. 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Petitioner has not made a substantial showing of the denial of his constitutional rights. Therefore, this court will not issue a COA.[6]

An Order follows, consistent with this Memorandum Opinion.


Date:   September 1, 2017                                    _____/s/_____
                                                            Ellen Lipton Hollander
                                                            United States District Judge

---

[6] The district court's denial of a COA does not preclude a petitioner from seeking permission from the appellate court for a COA